**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GROUND ZERO CENTER FOR NON-
VIOLENT ACTION, a Washington non-
profit corporation; WASHINGTON
PHYSICIANS FOR SOCIAL
RESPONSIBILITY, a Washington non-
profit corporation; GLEN MILNER, an
individual,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF
THE NAVY; RAYMOND E MABUS, JR.,
in his official capacity as Secretary
of the Navy; ROGER M NATSUHARA,
in his official capacity as Principal
Deputy Assistant Secretary of the
Navy; TERRY J. BENEDICT, Rear
Admiral, in his official capacity as
Director of Navy Strategic Systems
Programs; PETE DAWSON, Captain,
in his official capacity as
Commanding Officer of Naval Base
Kitsap; CHRISTINE STEVENSON, in
her official capacity as Project
Manager at Naval Facilities
Engineering Command Northwest,

*Defendants-Appellees.*

No. 14-35086

D.C. No.
3:12-cv-05537-
RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted May 6, 2016
Seattle, Washington

Filed June 27, 2017

Before:  Susan P. Graber, Marsha S. Berzon,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of the United States Department of the Navy in an action brought by Ground Zero Center for Nonviolent Action, alleging that the Navy had not fully complied with the National Environmental Policy Act's disclosure requirements for the expansion of a TRIDENT nuclear submarine operating center; vacated the district court's order concerning Ground Zero's use of the inadvertently filed portions of the record; and remanded.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

TRIDENT submarines, armed with nuclear missiles, are brought to the Naval Base Kitsap in Bangor, Washington for maintenance. The base has an Explosives Handling Wharf for such maintenance, and the Navy began considering the possibility of building a second Explosives Handling Wharf ("EHW-2").  To comply with NEPA, the Navy prepared and published an Environmental Impact Statement ("EIS") for EHW-2.  The EIS mentioned that a particular alternative site had been considered but rejected because it would not comply with requirements established by the Department of Defense Explosives Safety Board and the Naval Ordnance Safety and Security Activity.  Ground Zero challenged the EIS, and during the litigation, the Navy revealed significant information not fully disclosed in the EIS.

The panel held that the Navy violated NEPA's public disclosure requirement by not revealing that the Safety Board withheld approval of its plan for the construction of EHW-2. The panel also held that the Navy further violated NEPA by withholding the non-disclosed portions of the appendices to the EIS. The panel further held that both disclosure errors were, however, harmless.

The panel narrowly construed the district court's order restricting Ground Zero's use of portions of the record. The panel concluded that it was not clear that the district court order comported with the First Amendment, and remanded for further proceedings to determine whether restrictions on Ground Zero's speech were warranted.  The panel outlined the new standard to be applied on remand: to impose continuing restrictions on Ground Zero's public dissemination of documents that the Navy inadvertently made public, a court must identify "compelling reason [to impose

the restriction] and articulate the factual basis for its ruling, without relying on hypothesis or conjecture."

## COUNSEL

Katherine George (argued), Harrison-Benis LLP, Seattle, Washington; James E. Lobsenz (argued), Carney Badley Spellman P.S., Seattle, Washington; for Plaintiffs-Appellants.

John David Gunter, II (argued) and Luther L. Hajek, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

David S. Mann, Gendler & Mann LLP, Seattle, Washington, for Amici Curiae Allied Daily Newspapers of Washington and Society of Environmental Journalists.

## OPINION

BERZON, Circuit Judge:

We consider, principally, the adequacy of the United States Department of the Navy's ("Navy's") Environmental Impact Statement ("EIS") for the expansion of a TRIDENT nuclear submarine operating center. We also address whether a district court order restricting the dissemination of documents that the Navy erroneously made available through the court's public docket violated due process or the First Amendment.

**I**

## Background

### A.  The Navy's Proposed Wharf

Bangor, Washington, is home to Naval Base Kitsap ("Kitsap"), the Navy's main operating hub for the Pacific fleet of its TRIDENT submarine program.  TRIDENT submarines, armed with nuclear missiles, are brought to Naval Base Kitsap for, among other things, maintenance of those missiles.  The base has an Explosives Handling Wharf ("EHW" or "EHW-1") where such maintenance is performed.

During the 1990s, the Navy began upgrading the missiles used on the TRIDENT submarines.  These upgraded missiles require increased maintenance and will require even more frequent maintenance as they age.  The Navy estimates that its increased maintenance projects at Kitsap will need 400 "operational days" per year, meaning capacity to perform 400 days' worth of maintenance sessions in a year.  The existing EHW at Kitsap cannot support those needs.  In general, the present EHW can provide 300 operational days per year; in some years, due to the need for upkeep on the wharf, it is usable for fewer than 250 operating days.

The Navy decided that it therefore needed to increase its operational capacity for missile maintenance at Kitsap.  It began considering the possibility of building a second Explosives Handling Wharf ("EHW-2").  To comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Navy prepared and published an EIS, which described the proposal and its projected environmental impacts.

The EIS primarily discussed environmental impacts arising during the construction of EHW-2, as well as the effect the completed structure and its regular operations would have on the environment. Several alternatives were considered in depth, all of which (with the exception of "no action") involved constructing a second wharf adjacent to the first. The alternatives varied in their structural details—for example, in the size of the support piles on which they would rest—but not in location. According to the Navy, there were no other viable sites for the proposed wharf because of the function the wharf serves. It must be built in water deep enough to allow submarines to operate, but not so deep as to make construction of the wharf infeasible.

In addition to considerations of ocean depth, the EIS made numerous references to constraints on site selection imposed by the need to handle explosive materials safely. It mentioned that a particular alternative site had been considered but rejected because it would not comply with requirements established by the Department of Defense Explosives Safety Board ("Safety Board") and the Naval Ordnance Safety and Security Activity ("NOSSA"), which issue and implement safety guidelines surrounding the proper handling of explosives. The EIS also referred to a potential plan for a shore-based terminal, rejected for the same reason.

In addition, the EIS explained, to comply with Safety Board and NOSSA "requirements to protect buildings located in the vicinity of explosives handling operations," the construction of EHW-2 would involve the demolition or modification of more than a dozen facilities or structures near the proposed site. Noting that "[a]ll facilities constructed at the Bangor waterfront must comply with [Safety Board] and NOSSA requirements regarding explosives safety

restrictions," the EIS characterized the proposed location for EHW-2 as "the only available location along the Bangor waterfront that ensures designated restricted areas remain within Navy property boundaries and required separation distances between facilities are maintained."

In a section labeled "Public Health and Safety," the Navy reported that the existing EHW has "operated safely for over 30 years," and that "[o]perations at the EHW-2 would be no different from operations at the existing EHW." The section concluded that "there would be no resulting impact to public health or safety" from the proposed development of EHW-2, as there would be "[n]o increased danger or change from current safe operations."

At several points, the EIS referenced appendices. Three of these appendices were redacted in their entirety in the publicly released version of the EIS. According to the EIS's references and the appendices' titles, Appendix A contained supplemental information describing the purpose and need for the project, Appendix B contained additional information regarding alternatives to EHW-2 that the Navy had considered, and Appendix C contained information regarding the distance "within which activities and facilities are restricted to assure protection to life and property in the event of an accident," which is referred to as an "[e]xplosives [s]afety [a]rc." The EIS stated that these appendices had been redacted because they contained Unclassified Controlled Nuclear Information ("UCNI") the Navy deemed unfit for public dissemination.[1]

---

[1] Title 10 U.S.C. § 128(a) permits the Secretary of Defense to order that certain information relating to nuclear material be withheld from public disclosure under the Freedom of Information Act ("FOIA"),

After going through a public comment period and issuing a final EIS, the Navy issued a Record of Decision announcing that it had decided to implement one of the proposed EHW-2 construction plans.  The EHW-2 plan selected would be adjacent to EHW-1 and would provide 300 operational days for missile maintenance every year.  Combined with the operational days available at EHW-1, the 300 additional operational days permitted by EHW-2 would be more than sufficient for the TRIDENT program's needs.

## B.    Ensuing Litigation

Several months after the final EIS was released, Ground Zero Center for Nonviolent Action, Washington Physicians for Social Responsibility, and peace activist Glen Milner (collectively, "Ground Zero") filed a complaint against the Navy and several officials in the Western District of Washington.  Ground Zero alleged that the Navy had not fully complied with NEPA's disclosure requirements and sought an injunction to stop construction of EHW-2.

### 1.   NEPA Claims

During this litigation, the Navy revealed significant information not fully disclosed in the EIS.[2]  In particular, one group of documents indicated that the Safety Board had

5 U.S.C. § 552, and NEPA.  *See also* 42 U.S.C. § 4332(2)(C)(v); 32 C.F.R. § 223.6; *Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 143 (1981) (explaining that "[p]ublic disclosure of the EIS is expressly governed by FOIA").

[2] Much of this information was included in the administrative record the Navy submitted to the district court.  Some was released in response to FOIA requests by Ground Zero.

rejected the EHW-2 proposal. According to these documents, the Safety Board had issued only conditional site approval. The conditional approval "did not accept safety risks associated with" the proposed separation distance between EHW-1 and EHW-2, or the proposed separation between the two EHWs and a complex on another pier. Worried that an "explosive mishap involving one missile" could propagate additional explosions involving other missiles or submarines being handled at the same time, the Safety Board was willing to accept the site approval request only if the Navy conducted a study to "prove that the likelihood of all risk is less than $1x10^{-6}$." The Navy had pointed to previous safety studies conducted before approving the locations of two EHWs at a similar base in Kings Bay, Georgia, but the Safety Board was not satisfied with the Navy's reliance on those studies.

These new documents also indicated that, rather than conduct the studies the Safety Board required as a condition of its approval of EHW-2, the Navy had opted to obtain site approval via secretarial certification, a process by which the Secretary of the Navy can approve construction despite any Safety Board concerns. Two days before the publication of the final EIS, an internal Navy memorandum stated that the Secretary had "accept[ed] the risk for mission related operations and construction of" EHW-2, thus permitting the construction to proceed.

The Navy also included in the administrative record more complete—that is, less redacted—versions of EIS Appendices A, B, and C than had been available to the public. As noted, these appendices had not been disclosed during the EIS process on the ground that they contained UCNI. The reason why much of the previously redacted information was now made public, the Navy explained, was that the Navy had

"conducted additional review during the preparation of the Core Administrative Record and . . . determined that portions of these documents should not be designated as UCNI and can be released consistent with current Navy and Department of Defense Guidance."  As a result of that review, Appendix A was released in its entirety; Appendix B was released in a partially redacted form; but Appendix C remained entirely redacted except for a textual description of its contents.  The now-unredacted text indicated that Appendix C consisted of an image of the explosives safety arcs for EHW-1 and EHW-2 and a brief description of the conditions depicted in the image.

Ground Zero argued that these newly released documents demonstrated that the Navy had violated NEPA by not adequately disclosing the risks of EHW-2; by not disclosing the Safety Board's lack of approval for the site; by not disclosing the appendices more completely during the EIS process; and by not engaging in a reasonably thorough analysis.  The district court disagreed, denying Ground Zero an injunction, and rejecting Ground Zero's motion for summary judgment.  Instead, the court granted the Navy's summary judgment motion.  Ground Zero appealed to this court.

### 2.  The District Court Order Regarding Navy Documents

In addition to appealing the district court's rejection of its NEPA claims, Ground Zero appeals an order of the district court ("Order") restricting Ground Zero's use of documents that the Navy made available for a time through the public docket.  Ground Zero argues that the Order violates due process and the First Amendment.

As the district court explained, its Order issued after the Navy's attorney "informed Court staff that documents containing Classified Information and/or Unclassified Controlled Nuclear Information . . . have been inadvertently disclosed." The Order sealed portions of the record and directed that, from that point forward, no party was to discuss or reference any of the documents identified by the order "in any hearing in this matter"; no party was to "further disseminate[]" any of the documents; and, once the Navy prepared replacements, the parties were to return all the CDs in their possession containing the record, as well as their copies of the identified documents. Because some of Ground Zero's filings had discussed some of the relevant documents, the court also placed those filings under seal.

Ground Zero filed a motion to unseal the records and lift the restraints that the district court had put in place. It pointed out that versions of the sealed documents were available publicly, as were news articles related to the documents, and that Ground Zero already had sent some of the documents to members of the media. The court held a hearing on the motion, which it ultimately denied.[3] Ground Zero appeals that decision as well.

---

[3] The district court amended its initial order to permit Ground Zero to keep its copies of the documents in question "for the *sole* purpose of appealing their [F]irst-[A]mendment claims." The Navy subsequently produced redacted versions of most of the inadvertently disclosed documents; determined that two of the documents could be released in their entirety; and decided that two should be withheld in their entirety.

## II

## NEPA Issues

NEPA requires federal agencies to "take a 'hard look' at the environmental consequences of their actions by preparing an EIS for each 'major Federal action significantly affecting the quality of the human environment.'" *Lands Council v. McNair*, 537 F.3d 981, 1000–01 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (quoting 42 U.S.C. § 4332(2)(C)).  The EIS must include "full and fair discussion of significant environmental impacts" and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

Ground Zero challenges the EIS on several grounds. First, Ground Zero maintains that the Navy violated NEPA regulations by not disclosing in the EIS the portions of Appendices A, B, and C that are now public.  Next, Ground Zero points to the omission from the EIS of the Safety Board's disapproval of the EHW-2 plans, and also of the Navy's own analysis of potential risks from explosion. Finally, Ground Zero faults as insufficiently thorough the Navy's analysis of alternatives to building EHW-2.  We address each ground in turn.

### A. Failure to Disclose Certain Information in the Appendices to the EIS

When the EIS issued, nothing in the appendices at issue was publicly disclosed.  During this litigation, the Navy revealed significant portions of the appendices.  Ground Zero

views this later disclosure as a concession that the disclosure of this material would not harm national security, so the material should have been disclosed in the first place. Had it been, Ground Zero maintains, it could have been subject to public consideration and comment.

The Navy responds that "different reviewers within the Navy" were in charge of the decision at different steps. In other words, different officials were responsible at different points for the redaction decisions and made different calls. A decision whether certain information may be disclosed, the Navy emphasizes, is based not on "a bright line, but requires the reviewing official to exercise judgment in the context of a particular risk situation."

We agree with Ground Zero that the Navy's failure to disclose the later-produced appendix information violated NEPA. The governing regulations require that "[i]f an agency prepares an appendix to an environmental impact statement the appendix shall . . . [b]e circulated with the environmental impact statement or be readily available upon request." 40 C.F.R. § 1502.18. NEPA's public disclosure requirements are "expressly governed by FOIA," *Weinberger*, 454 U.S. at 145, however, and some sensitive nuclear information, as noted, is protected from FOIA's disclosure requirements, *see* 10 U.S.C. § 128; 32 C.F.R. § 223.6. Specifically, UCNI is protected from FOIA's disclosure requirements when "dissemination of such information could reasonably be expected to have an adverse effect on the health and safety of the public or the common defense and security by increasing significantly the likelihood of the illegal production of nuclear weapons or the theft, diversion, or sabotage of" special nuclear material, the facilities and equipment associated with such material, or nuclear weapons

in Department of Defense custody.  32 C.F.R. § 223.6(a)(1), (h)(1); *see also* 10 U.S.C. § 128.

This FOIA standard for nondisclosure is an objective one, as its text indicates.  And the Navy does not now maintain that the partially redacted versions of the EIS appendices released in this litigation actually meet the objective "reasonably be expected to have an adverse effect" standard. Indeed, it would be strange for the Navy to make that argument because it has, in this litigation, released them publicly.  Nor does the Navy argue that potential adverse effects would have occurred had the documents been released during the EIS process but would now no longer occur.

NEPA requires disclosure "to the fullest extent possible." 42 U.S.C. § 4332.  Unless the standard for nondisclosure actually was satisfied when the Navy first refused to disclose any part of the appendices, we cannot hold that its nondisclosure was justified.  And the requisite standard was not met, according to the Navy's own current determination. The Navy therefore failed to comply with NEPA's mandate.

Nonetheless, the Navy's failure to disclose the portions of the appendices at issue was harmless error.   When considering an agency's failure to comply with NEPA, we examine whether the error "materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016). Ground Zero has not demonstrated that NEPA's goals were materially impeded.

Ground Zero has not specified any information in the now-revealed portions of Appendix A or B that would have made a difference in agency decisionmaking or public participation. It points only to Appendix C, asserting that "releasing the redacted version of Appendix C during the EIS process would have alerted the public that there was *no* study of explosives safety, as the content was limited to one map depicting 'arcs' wherein people and buildings could be hit by an explosion, and less than half a page of discussion related to those arcs." The very paucity of the appendix, Ground Zero argues, "was important to the public's understanding of how very little attention was devoted to potentially deadly blasts, and its release would have increased pressure for meaningful study."

This contention is unpersuasive. The EIS does not convey the impression that Appendix C contains some significant amount of analysis regarding explosives safety. In the EIS, Appendix C is labeled "Explosives Safety Arcs for Existing EHW and Proposed Second EHW." The EIS states, straightforwardly, that Appendix C contains "[a]rcs for the existing EHW and the proposed EHW-2," which are not being released because they are UCNI. In one other location, the EIS states that "designated restricted areas" at Bangor are "further discussed in Section 1.1 and Appendix C." That statement, standing alone, could be construed to suggest that there is meaningful discussion in Appendix C beyond a picture and a caption. But, in light of Appendix C's heading, it is unlikely that any reader would have thought that Appendix C contained a thorough analysis of safety risks. We therefore hold that the Navy's error in failing to release the additional information in the appendices was harmless.

## B.  The Safety Board's Disapproval

The EIS did not acknowledge the Safety Board's rejection of the planned construction of EHW-2.  According to the Navy, it had no obligation to include any information about the Safety Board's analysis.  The Safety Board has a mandate of "maximum possible protection," says the Navy, and so will reject proposals even when their risk is so low that it does not rise to NEPA's standard of "reasonably foreseeable" risks that must be disclosed.  *See* Department of Defense, *Directive 6055.9E* at 2 (Aug. 19, 2005).

To support this position, the Navy points to *Ground Zero Center for Non-Violent Action v. U.S. Department of Navy*, 383 F.3d 1082, 1090–91 (9th Cir. 2004) ("*Ground Zero I*").  *Ground Zero I* concerned the adequacy of the Navy's NEPA compliance with regard to a different modification of the TRIDENT missile program at Bangor.  As to that modification, Ground Zero had noted that the Navy incorporated the risk of an accidental explosion into its planning of the Bangor base's layout, arguing that the Navy therefore had to include its analysis of that risk in its EIS.  *Id.* at 1090.

We disagreed, noting that the Defense Department's "regulations that govern base planning have different aims and standards than NEPA," explicitly contrasting the "maximum possible protection" standard with the "reasonably foreseeable" standard found in NEPA regulations.  *Id.*; *see* 40 C.F.R. § 1508.8(b) (defining "effects" for NEPA purposes to include "indirect effects" that are "reasonably foreseeable").  In *Ground Zero I*, the Navy had done its own estimation of the risk of accidental explosion and concluded that the odds were between one in 100 million

and one in one trillion.  383 F.3d at 1090.  We concluded that "such remote possibilities do not in law require environmental evaluation."  *Id.*  Here, the Navy argues, the risks that concerned the Safety Board are similarly remote, and so did not need to be discussed in the EIS.

In assessing the Navy's invocation of *Ground Zero I*, it is important to bring into focus the precise import of Ground Zero's reliance on the Navy's failure to disclose the Safety Board's lack of approval.  In part, Ground Zero contends that omitting mention of the Safety Board's disapproval either indicates a violation of NEPA's foundational requirement that government agencies "take a 'hard look' at environmental consequences before committing to action,"  *id.* at 1086 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)), or, at least, a failure fully to communicate its internal consideration of those consequences to the public, as "[i]nternal discussion cannot satisfy NEPA." As to these challenges, *Ground Zero I is* largely controlling.

Here, as in *Ground Zero I*, the Navy calculated the risk of fatalities from an accidental explosion and concluded that it was extremely small.  Although the Safety Board was not satisfied with the Navy's studies, the record does not indicate that there was contrary *evidence* the Navy ignored.  Rather, it appears that the Safety Board thought the rigor of the Navy's studies inadequate.  The record shows that, even if the Navy's studies were not up to the Safety Board's standards, the Navy did take an adequately "hard look" at the issue of safety for NEPA purposes.  *See id.*

The Navy conducted an analysis of the collective and individual fatality risks faced by personnel at the wharf, based on previously conducted propellant hazard studies.  It also

evaluated separation distances between facilities based on data previously approved for the explosives handling facilities at Kings Bay, Georgia, where the Navy conducts similar operations.

More specifically, the Navy convened a meeting to discuss explosives risk, attended by the Safety Board, weapons manufacturers, the Office of the Chief of Naval Operations, and representatives from the Bangor base.  In addition, there was extensive written documentation at various levels within the Navy Command concerning the degree of risk, particularly during the process of obtaining a secretarial certification.  Finally, the Navy accommodated other Safety Board requirements related to explosives handling by adopting plans to modify or demolish buildings. These responses demonstrate that the Navy, far from ignoring safety concerns, was considering them carefully and responding where appropriate.[4]

"[W]hile we carefully scrutinize an agency's actions under NEPA, we must 'be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency.'"  *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1133 (9th Cir. 2006) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004)).  "Agencies are normally entitled to rely upon the reasonable views of their

---

[4] Ground Zero also objects to the Navy's decision not to discuss in its EIS the removal of an explosive fragment barrier at EHW-1.  The Navy decided to remove the barrier in 2011 as part of the pile replacement project at EHW-1.  That project was subject to a separate NEPA analysis, conducted before the Navy's risk analysis for EHW-2 and request for secretarial certification of the second site.  Challenges to the removal of the explosive fragment barrier are thus not before us.

experts over the views of other experts." *Ground Zero I*, 383 F.3d at 1090. Ground Zero has not demonstrated that the Navy's reliance on its own experts was unreasonable.[5] And, as mentioned in *Ground Zero I*, the Safety Board's mandate to assess "maximum possible protection" implicates risks that fall below NEPA's "reasonably foreseeable" standard. *See id.* That the Safety Board had risk concerns thus does not necessarily demonstrate substantive noncompliance with NEPA.

Further, *Ground Zero I* "rejected the notion that every conceivable environmental impact must be discussed in an EIS." *Id.* at 1089 (quoting *No GWEN All. of Lane Cty., Inc. v. Aldridge*, 855 F.2d 1380, 1385 (9th Cir. 1988)). As in that case, the Navy reasonably concluded that the risks that concerned the Safety Board here were small enough that the Navy did not have a duty to discuss them.[6]

In short, the Navy's safety analysis, including the decision to override the Safety Board, was not arbitrary or capricious, and was supported by substantial evidence. *See* 5 U.S.C.

---

[5] Ground Zero accuses the Navy of not considering that two wharfs necessarily create a higher safety risk than one, both because more missiles will be handled at two wharfs than at one and because an explosion at one wharf could cause a second explosion at the other. It is true that the Navy does not give detailed consideration to these phenomena. But its risk analysis does state that, given the very low risks involved at each wharf, even in "the highly unlikely event where both Wharfs were involved, the estimated probability of fatality would still fall below" one in one million.

[6] For the same reason, we reject Ground Zero's argument that the Navy was required to disclose the internal studies determining that the explosive risk was very low.

§ 706(2).   The analysis meets NEPA's requirements for a "hard look."   *See Ground Zero I*, 383 F.3d at 1086.

There is, however, a second, procedural strand to Ground Zero's complaint—that the EIS should have, but did not, reveal the Safety Board's refusal to approve the second wharf at the Bangor site.   In addition to requiring a "reasonably thorough discussion" of a project's environmental consequences, *id.* at 1089 (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)), "NEPA imposes on federal agencies conducting environmental review a duty to consult with certain other agencies," *Idaho Wool Growers*, 816 F.3d at 1102.   "[T]he language establishing NEPA's consultation requirement is expansive. It mandates consultation with any federal agency that has 'special expertise *with respect to any environmental impact involved.*'"   *Id.* at 1103 (emphasis in original opinion) (quoting 42 U.S.C. § 4332(2)(C)).   These consultations "shall accompany the proposal through the existing agency review processes."   *Id.* (quoting 42 U.S.C. § 4332(2)(C)).   And here, of course, the military's own procedures required consultation with the Safety Board before proceeding with the project, and the consultation actually occurred.   Ground Zero maintains that by omitting reference to the Safety Board's objections, the Navy violated the public disclosure aspect of NEPA's consultation requirement.   On this point, *Ground Zero I* does not control.   In that case, there was no indication the Navy failed to get approval from any safety authority or otherwise encountered dissatisfaction from any other agency with its risk assessment.   *See Ground Zero I*, 383 F.3d at 1089–91.

Under the circumstances here, the Navy's own adequate determination that the risk of explosion was low does not excuse its failure to disclose in the EIS the results of its

consultation with the Safety Board. NEPA mandates consultation with "*any* Federal agency which has jurisdiction by law or special expertise with respect to *any* environmental impact involved." 42 U.S.C. § 4332(2)(C) (emphases added). This language applies with special force to the Safety Board. The Safety Board, created by the secretaries of the military departments under 10 U.S.C. § 172, is empowered by the Department of Defense to promulgate "binding, minimum safety standards" to protect people and property "from the potential damaging effects of [Department of Defense] military munitions." Department of Defense, *Directive 6055.9E* at 2. Given that the Safety Board has both "jurisdiction by law" and "special expertise," and given that the Safety Board was in fact consulted as required, the EIS should have disclosed the Safety Board's comments regarding the risks of negative environmental consequences from an explosion at the second wharf.

Moreover, throughout the EIS, the Navy relied on compliance with the Safety Board's explosives safety standards to justify a variety of decisions. The Navy stated, for example, that EHW-2's placement is "the only available location along the Bangor waterfront that ensures . . . required separation distances between facilities are maintained." It rejected a specific alternative site on the ground that it would not comply with the Safety Board's guidelines surrounding the proper handling of explosives. And in response to a public comment concerned about the safe handling of explosives, the Navy explained that "[a]ll facilities constructed at the Bangor waterfront must comply with [Safety Board] and NOSSA requirements regarding explosives safety restrictions."

The EIS thus created the appearance that the Navy was intent on complying with the Safety Board's standards. Nowhere did the EIS state otherwise, or reveal that the Navy was seeking a secretarial certification to allow it to deviate from the Safety Board requirements.

Ground Zero contends that the Navy "lied" when it represented that EHW-2 complied with the Safety Board's requirements; the Navy responds that the Safety Board's regulations themselves permit the secretarial certification method of approval for structures that "deviate from" the Safety Board's requirements, so it was not false to say the structure complied with the regulations.  There is no need to settle this dispute as to whether there was an affirmative misrepresentation.  Whether there was or not, the combination of the affirmative reliance on the Safety Board requirements and the failure to disclose the Safety Board's disapproval of the Navy's risk assessment was inconsistent with the responsibility NEPA imposed to disclose the results of consultation with expert agencies.

This omission was, however, once again harmless.  NEPA requires "that responsible opposing viewpoints are included in the final impact statement," a goal that "reflects the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process."  *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (quoting *California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982)).  But here, the opposing viewpoint was fully considered in the internal decisionmaking process, even though its result was not fully disclosed to the public.

NEPA's requirement that agency consultation be disclosed also fosters NEPA's overarching goals of "[i]nformed decisionmaking and public participation." *Idaho Wool Growers*, 816 F.3d at 1102–04.  But, as we have already explained, the Navy had no responsibility to *discuss* in the EIS the Safety Board's risk assessment, as it concerned a level of risk much lower than the threshold for exposure in an EIS.  That being the case, public participation as to the risk assessment actually pertinent to the EIS would not measurably have been enhanced by the knowledge that the Safety Board thought the Navy's methodology inadequate to determine risk at a more fine-grained level than it either did or was required to do.

In sum, by not disclosing the Safety Board's assessment, the Navy violated its NEPA obligation, after "consult[ing] with" expert agencies, to "ma[k]e available . . . to the public" the comments and views of the consulting agency "to the fullest extent possible."  42 U.S.C. § 4332.  But, given the gap between its risk assessment responsibility in the EIS and the approach the Safety Board preferred, the failure to disclose was harmless.

## C.  Reasonably Thorough Analysis

NEPA regulations require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  The regulations note that "[t]his section is the heart of the environmental impact statement." *Id.* § 1502.14.

Here, the EIS's listed "alternatives" are quite similar to each other. Aside from the "no action" alternative, the proposed actions all involved building a second explosives handling wharf at an identical location, adjacent to EHW-1, differing only in some of their construction and support details.

The Navy's listed alternatives, although narrow in scope, were "reasonable" in light of its operational goals. The overriding goal of the project was reaching an operational capacity of at least 400 days per year at Kitsap. One possible alternative to building a second wharf, expediting the repair of EHW-1, would not suffice, as it would provide only around 300 operational days per year.[7] Given the Navy's goal of 400 operational days per year, it is clear that EHW-1 on its own would be inadequate even after repair. Finding another location for the wharf was not feasible, because EHW-2 had to be located where the water was deep enough for submarine operability but shallow enough to permit the wharf's construction.

True, "an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v.*

---

[7] Similarly, Ground Zero is unpersuasive when it argues that the Navy violated NEPA regulations "by taking action in May 2011 to limit the choice of reasonable alternatives to a new wharf, announcing a decision *not* to replace all of the aging wharf's deteriorating piles at one time." NEPA forbids an agency from taking an action that "[l]imit[s] the choice of reasonable alternatives" before an EIS is issued, 40 C.F.R. § 1506.1(a)(2), as well as "commit[ting] resources prejudicing selection of alternatives before making a final decision," *id*. § 1502.2(f). But the expedited repair of EHW-1 *in lieu* of building EHW-2 was not a reasonable alternative. The Navy's decisions regarding the time frame for EHW-1's repair therefore did not violate the NEPA regulations.

*U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). But "[a]gencies enjoy 'considerable discretion' to define the purpose and need of a project." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)).   The Navy's operational goal of 400 days per year is not arbitrary, capricious, unreasonably narrow, or otherwise flawed. *See City of Carmel-by-the-Sea*, 123 F.3d at 1156–57.   And the Navy's considered alternatives were "reasonable in light of the cited project goals." *Id.* at 1155.

In sum, the Navy violated NEPA's requirements in some respects, but its errors were harmless with regard to meeting its basic NEPA obligations.

## III

### The District Court's Order Regarding the Record

Ground Zero's other challenge is to what it calls the district court's "gag order."  The Order, in addition to sealing part of the district court record, prevented Ground Zero from disseminating or further referencing in the litigation documents the Navy inadvertently disclosed.  By doing so, Ground Zero contends, the Order violates due process, because it leaves unresolved the question whether Ground Zero may disseminate identical copies of the documents if it obtains those copies from independent sources and so is unconstitutionally vague.  And, Ground Zero maintains, the Order also violates the First Amendment as a prior restraint on speech.

With regard to the due process challenge: Neither the text of the so-called "gag order" nor the district court's subsequent clarifications squarely state whether Ground Zero may disseminate copies of the sealed documents it obtains from independent sources.  The original Order identified a series of documents and provided that none of them "shall be discussed or referenced in any hearing in this matter" or "further disseminated."  Reading that Order in light of the district court's comments as to its scope and purpose, *see, e.g.*, *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993), we readily construe it as not having the reach Ground Zero fears.

At the hearing on Ground Zero's motion to unseal, the district court stated that it would not "sanction the plaintiffs for possessing or finding [the documents] from Google."  The court also stressed that its intent was to avoid "expand[ing] the reach of these documents by including them in statements, arguments, [or] evidence for purposes of th[e] preliminary injunction."  These comments indicate that the Order did not forbid Ground Zero from disseminating copies of the sealed documents if procured from an independent source.  By independent source, we mean what the district court implied: Ground Zero may discuss and distribute the documents in question so long as it acquires the documents from a source not involved in this litigation.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) (permitting dissemination of information identical to that subject to a protective order so long as the "information is gained through means independent of the court's processes").  It may do so even if the independent source originally obtained the documents from Ground Zero, so long as Ground Zero disseminated them before the district court entered the sealing order. *Cf. United States v. Caparros*, 800 F.2d 23, 27 (2d Cir. 1986)

(concluding that from whence a document was "most recently" obtained determined the court's power to restrict dissemination of it).   We so construe the Order, thereby resolving Ground Zero's vagueness objection.

With regard to the First Amendment challenge:   The parties identify two relevant lines of cases, neither of which directly addresses the issue raised here.   The Navy analogizes the district court's Order to a protective order shielding pretrial discovery, not publicly disclosed, from subsequent, unilateral public disclosure.   Ground Zero invokes cases invalidating prior restraints on speech.   The precise issue in this case is whether a litigant who obtains information from public filings *later* sealed may be prohibited from further dissemination of that information.   Whether the First Amendment precludes such a prohibition is a question that falls somewhere between the analogies the parties propose.

On the one hand, *Seattle Times Co. v. Rhinehart* makes clear that courts have significant discretion to constrain litigants from disseminating information obtained through litigation.   *Seattle Times* upheld a trial court's protective order prohibiting the Seattle Times, a party to the case, from publishing or disseminating information obtained in discovery.   467 U.S. at 27, 37.   In light of *Seattle Times*, this court, and many others, have applied relaxed First Amendment scrutiny to district courts' restrictions of litigants' speech given "the relationship between [them] and the court system."   *Levine v. U.S. Dist. Court*, 764 F.2d 590, 595–96 (9th Cir. 1985) (listing cases).   Like the Seattle

Times, Ground Zero is a party to the litigation and obtained the disputed documents in the course of litigation.[8]

The government's submission of an administrative record to a court for review differs in some important respects, however, from the discovery process in a normal civil trial. Protective orders safeguard the interests of litigants who have no choice but to turn over sensitive information to the other party. *See Seattle Times*, 467 U.S. at 29–32, 34–36. When privileged information is turned over inadvertently to a party in the course of discovery, applicable privileges generally are not waived. Fed. R. Evid. 502(b). Far from obtaining the right to share the inadvertently produced documents, the party who mistakenly received the information must "promptly return, sequester, or destroy" it once notified it is privileged. Fed. R. Civ. P. 26(b)(5)(B). *Seattle Times* emphasized that restrictions on litigants' use of discovery documents are permissible because "restraints placed on discovered, but not

---

[8] Applying these precepts, Ground Zero surely would not have had a First Amendment right to disseminate the information at issue had the Navy in the first instance properly submitted it under seal. Nor did the Navy have an independent obligation to publish this information under NEPA. NEPA does not require government agencies publicly to disclose all the information on which they rely in preparing an EIS. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 635 F.3d 1109, 1116 (9th Cir. 2011) ("*SLOMFP*"). *SLOMFP*, for example, addressed a NEPA challenge to a decision by the Nuclear Regulatory Commission and considered whether the Commission should hold closed hearings to discuss sensitive information with the plaintiff organizations. *Id.* at 1117–18. We held that such hearings were not required, but implied that an agency dealing with sensitive information in the NEPA context could potentially use such hearings, or analogous devices such as sealed filings, to demonstrate its NEPA compliance to interested parties and, potentially, to courts. *Id.*

yet admitted, information are not a restriction on a traditionally public source of information." 467 U.S. at 33.

By contrast, the administrative record filed in a NEPA court case is "a traditionally public source of information." The Navy knew, or should have known, that the documents it was filing would be made public. Furthermore, it was required to turn over to Ground Zero only documents that would have been available under FOIA to anyone who requested them. *See SLOMFP*, 635 F.3d at 1115–16. Recognizing its limited responsibility, the Navy requested additional time to submit the administrative record and initially redacted some information from the public docket.

In short, the Navy's publication here was—albeit inadvertently—to the public, not simply to the opposing party and the court. It occurred during litigation, but the Navy had no obligation to submit the portions of the documents now contested. The presuppositions of the *Seattle Times* line of discovery cases are thus only partly pertinent.

But this case also is not entirely parallel to the prior restraint cases involving media organizations. The First Amendment generally protects those who distribute information obtained through public court proceedings. *See Okla. Publ'g Co. v. Dist. Court*, 430 U.S. 308, 310–11 (1977) (per curiam); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975). That protection attaches in at least some situations where the government inadvertently discloses information to the public. *See Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989).

Here, Ground Zero "lawfully obtain[ed] truthful information about a matter of public significance," *id.* at 533

(citation omitted), and it did so through a channel accessible to any interested member of the public. That channel, the district court's docket, itself implicates the public's common law and First Amendment rights of access to documents filed in court proceedings. *See San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1101–02 (9th Cir. 1999) (recognizing under the common law a presumption of public access to judicial records filed in civil cases); *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (recognizing that a qualified First Amendment right of access applies to "court proceedings and documents"). Further, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam), indicates that national security interests, such as those the Navy asserts here, are generally insufficient to overcome the First Amendment's "heavy presumption" against the constitutionality of prior restraints, even against those who disseminate information obtained illegally—which is not, of course, what occurred here. In short, because the district court's Order targets information the Navy released not just to Ground Zero but also to the public, it implicates Ground Zero's First Amendment rights differently than would a properly implemented protective order concerning ordinary pretrial civil discovery, like the one considered in *Seattle Times.*

Yet, the Order's reach also differs significantly from the prohibitions considered in the prior restraint cases. In the prior restraint cases, media organizations were exposed to liability for publishing information regardless of how it was obtained. *See Cox Broad. Corp.*, 420 U.S. at 471–72; *Okla. Publ'g Co.*, 430 U.S. at 308; *N.Y. Times Co.*, 403 U.S. at 714. Here, Ground Zero may disseminate the documents at issue so long as it obtains them from an independent source. The Order therefore prohibits dissemination *only* of those

documents filed in error that Ground Zero acquired exclusively through this litigation and that it had not already disseminated when the Order was issued.

Because neither of the lines of cases the parties put forward is quite on point here, we chart a middle course. We conclude that, because the Navy filed the contested documents on the public docket, to impose a restriction on Ground Zero's further public disclosure of them, the Navy must meet a stricter standard than the showing of good cause necessary to obtain a protective order in the typical discovery context. Fed. R. Civ. P. 26(c).

Our caselaw on protective orders regarding discovery materials provides a baseline. A party seeking an ordinary protective order under Federal Rule of Civil Procedure 26(c) must show that "specific prejudice or harm will result if no protective order is granted." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002). If the party makes this showing, the court must then determine if an order is necessary by "balanc[ing] the public and private interests " at stake. *Id.* at 1211. Even if we were to find the district court's Order precisely analogous to a protective order—and we ultimately do not—the district court should have engaged in this two-step analysis. It is not clear that it did.

Because the Order in this case raises more serious First Amendment concerns than would a typical protective order affecting only discovery materials, however, we require a showing of more than good cause to justify it, as courts have done in other cases raising similar First Amendment questions. For instance, once information subject to a protective order is made available to the public in the course

of a trial, the party seeking to limit public access must meet a higher threshold to justify re-sealing that information. *See Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) (holding that "the ordinary showing of good cause which is adequate to protect *discovery material* from disclosure cannot alone justify protecting such material after it has been introduced at trial," and concluding that "only the most compelling showing can justify" continued secrecy); *see also In re Violation of Rule 28(D)*, 635 F.3d 1352, 1358 (Fed. Cir. 2011) (quoting *Poliquin* within approval).

We also require parties to show "compelling reasons" to justify sealing documents attached to dispositive motions and other filings that relate to the merits of a case, even when those documents were produced pursuant to a sealing order. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006) (holding that "[t]hose who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that compelling reasons support secrecy" (internal quotation marks omitted)); *see also Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir.), *cert. denied*, 137 S. Ct. 38 (2016) (applying the same standard to documents attached to motions "more than tangentially related to the merits of a case"). This higher standard is warranted because, "[u]nlike private materials unearthed during discovery, judicial records are public documents almost by definition, and the public is entitled to access by default," a fact that "sharply tips the balance in favor of production when a document, formerly sealed for good cause under Rule 26(c), becomes part of a judicial record." *Kamakana*, 447 F.3d at 1180; *cf. Oregonian Publ'g Co.*, 920 F.2d at 1466 (stating that, where the First Amendment right of access applies, public access can be restricted only where specific factual findings show that

"(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest").

Although we read Ground Zero's briefs as challenging the restrictions on its dissemination of the materials filed, rather than the district court's sealing decision as such, caselaw analyzing when it is appropriate to seal presumptively public court records is nevertheless instructive. The district court imposed its restrictions on Ground Zero's speech as part of an order that not only withdrew the erroneously filed documents from the public judicial record but also sealed two of Ground Zero's briefs relating to its motion for a preliminary injunction.[9] We have in the past applied the "compelling reasons" standard in evaluating whether to seal documents attached to preliminary injunction briefing where the issues discussed were more than tangentially related to the merits of a case. *See Ctr. for Auto Safety*, 809 F.3d at 1102.

Relying on these precedents, we hold that, to impose continuing restrictions on Ground Zero's public dissemination of documents that the Navy inadvertently made public, a court must identify "a compelling reason [to impose the restriction] and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Kamakana*, 447 F.3d at 1179 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)). We adopt this rigorous standard from a related context to reflect the First Amendment

---

[9] The government later agreed that one of these briefs could be unsealed in its entirety (although it appears still to be sealed on the electronic docket), and that the other could be filed with redactions.

interests implicated when the Navy posted the documents on the public docket. We decline to accept the analogy to classic prior restraints, which are almost never acceptable, *see N.Y. Times Co.*, 403 U.S. at 714, because Ground Zero remains a litigant whose use of documents acquired through litigation is properly subject to some degree of control by the district court.

National security concerns can, of course, provide a compelling reason for shrouding in secrecy even documents once in the public domain. *See Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1193 (9th Cir. 2007) (permitting the government to seal a Top Secret classified document pursuant to the common law state secrets privilege, despite its prior dissemination to the public); *but see Barre v. Obama*, 932 F. Supp. 2d 5, 8–9 (D.D.C. 2013) (distinguishing *Al-Haramain* in a case in which the government inadvertently posted information on the public docket and made no effort to remove it). Still, what we have here are not Top Secret—or even classified—documents.[10] To determine whether national security concerns justify continuing restrictions on Ground Zero's public speech here, more analysis is needed than occurred in the district court.

Although the district court considered declarations the Navy submitted in opposition to Ground Zero's motion to unseal, it did not make specific findings, either in its initial sealing order, or during its ruling on Ground Zero's motion to unseal, as to why Ground Zero may properly be prohibited from further disseminating the documents at issue. It is not

---

[10] With respect to the administrative record, there are two types of controlled unclassified information at issue: UCNI and "critical infrastructure security information." *See* 10 U.S.C. § 130e(c).

enough that the documents could have been protected from disclosure in the first instance, or that the documents "*implicate* national security" (emphasis added), in some vague sense.  Any restriction of Ground Zero's public speech at this point must be justified by specific facts showing that disclosure of particular documents would harm national security.  Relevant to this assessment will be the fact that the documents are not classified, and the extent to which the information they contain already has been publicly disclosed.

The district court's restrictions on Ground Zero's ability to use the inadvertently released information *in this litigation* are not subject to the same constitutional scrutiny, however.  The district court permitted Ground Zero to retain its copies of the inadvertently filed documents for purposes of appealing the First Amendment issue, but did not permit Ground Zero to cite the disputed documents "during summary judgment or trial" regarding its NEPA claims.  In doing so, the district court in essence required Ground Zero, in making its NEPA arguments, to rely only on what the court considered the proper public administrative record.  *See, e.g.*, *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989) (order) (holding, in a NEPA case, that "the district court properly limited review to the administrative record").  In ruling on the parties' motions for summary judgment, for instance, the court noted that "[i]nadvertent disclosure for purposes of litigating these motions does not demonstrate the Navy was improper in its earlier withholding" during the environmental review process.

Our caselaw interpreting NEPA's public disclosure requirement indicates that the parties and the court are to consider only information required to be disclosed under

FOIA.  *See SLOMFP*, 635 F.3d at 1116.  Ground Zero does not now argue that the information redacted in the replacement administrative record was improperly designated UCNI or that, absent the government's mistake, Ground Zero would have been entitled to it as part of the public administrative record.  As there has been no relevant challenge, we express no view on the merits of the district court's conclusion regarding the scope of the administrative record relevant to the NEPA inquiry.  We do note that, on remand, the court retains its ordinary authority to determine the content of the administrative record properly before it with regard to the issues presented, in accordance with the relevant statutes and the Federal Rules of Evidence and Procedure.  *See, e.g.*, *United States v. W.R. Grace*, 526 F.3d 499, 508–09 (9th Cir. 2008) (en banc) (explaining the district court's inherent "authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified"); *Animal Def. Council*, 840 F.2d at 1438 (concluding that the district court properly limited review to the administrative record and refused to permit discovery); *cf. Al-Haramain*, 507 F.3d at 1204–05 (concluding that, where a document was subject to the state secrets privilege, the court was required to treat the previously disclosed evidence as unavailable).

Accordingly, we vacate the district court's November 9, 2012 and July 29, 2013 orders pertaining to Ground Zero's use of the disputed documents and remand for further proceedings consistent with this opinion.

## CONCLUSION

The Navy violated NEPA's public disclosure requirement by not revealing that the Safety Board withheld approval of

its plan for the construction of EHW-2. The Navy further violated NEPA by withholding the now-disclosed portions of the appendices to the EIS.  Both disclosure errors were, however, harmless.  In all other respects, the Navy satisfied NEPA's requirements.  We therefore affirm the district court's order granting the Navy's motion for summary judgment.

We narrowly construe the district court's order restricting Ground Zero's use of portions of the record.  Even with this reading, it is not clear that the district court's order comports with the First Amendment.  We therefore remand for further proceedings to determine whether, under the standard we announce today,  restrictions on Ground Zero's speech are warranted.

The district court's grant of summary judgment to the Navy is **AFFIRMED**. We **VACATE AND REMAND** the district court's order concerning Ground Zero's use of the inadvertently filed portions of the record for further proceedings consistent with this opinion.